IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | NO.9:23-CR-00017-MAC |
| vs. | |
| NATHANIEL MOORE (1), | |
| Defendant. | |

**REPORT AND RECOMMENDATION**
**DENYING THE DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

On July 19, 2023, Nathaniel Moore ("Moore") and his co-defendant, Christopher Haywood, were indicted in the Eastern District of Texas for violating 21 U.S.C. § 841 and 18 U.S.C. § 2 (Possession With Intent to Distribute 5 Kilograms or More of a Mixture of Substance Containing a Detectable Amount of Cocaine—Aiding and Abetting). Pending before the undersigned is Moore's *Motion to Suppress* (Doc. #56).[1] The United States filed a response to Moore's motion (Dkt. #59), Moore filed a supplement (Dkt. #60), and the undersigned magistrate judge heard testimony and oral argument on April 24, 2024. The undersigned finds that the traffic stop was lawful at its inception, not unreasonably delayed, and that Moore gave valid consent for the search of his vehicle. Accordingly, the undersigned recommends denying Moore's *Motion to Suppress*.

---

[1] This motion is referred to the undersigned United States magistrate judge for review, hearing if necessary, and submission of a report with recommended findings of fact and conclusions of law. *United States v. Raddatz*, 447 U.S. 667, 681–84 (1980); *see also* 28 U.S.C. § 636(b)(1)(B) and E.D. TEX. LOCAL R. CR-59(a).

## I. The Traffic Stop

At the evidentiary hearing, the Government called Rusk County Sheriff's Office Lieutenant Keith Finchum ("Finchum") to testify about the traffic stop and search of Moore's vehicle on May 18, 2022. Finchum testified that prior to the stop, he was advised by an officer with the Nacogdoches Police Department that a black Honda Accord (with Wisconsin license plates) was travelling in tandem with another vehicle that was stopped in Nacogdoches and suspected of transporting unspecified illegal contraband.[2] (Tr. 9.) Finchum left his office in pursuit and was driving southbound when he observed the Honda travelling northbound on Highway 259. (Tr. 10-11.) While travelling in the opposite direction across a divided highway, Finchum observed the Honda "picking up speed [and pass] an 18-wheeler" in the inside lane of the highway. (Tr. 12, 21.) Finchum executed a u-turn and drove about 3.4 miles northbound until he reached Moore's vehicle. (Tr. 13.) Finchum's dash cam indicated he reached speeds in excess of 100 miles per hour ("MPH") to catch-up to the Honda. (Tr. 22.) Once he reached the Honda, Finchum pulled behind the vehicle and observed his own speed—which he testified was the same as the Honda—at 73-74 MPH. (Tr. 23-24, 43.) The posted speed limit for that stretch of highway is 70 MPH. (Tr. 23.)

Finchum initiated a traffic stop, which was recorded by his body and dash cam. (Gov't Ex. 1-6.) This footage corroborates Finchum's testimony of the stop. For the first couple minutes of the stop, Moore and Finchum engaged in a brief roadside conversation about passing 18-wheelers, and Finchum asked for Moore's driver's license and registration. At about three minutes into the stop, Finchum returned to his patrol car and reported Moore's license information to Dispatch. Dispatch reported to Finchum that Moore had an "eligible" license (not

---

[2] Finchum testified that the information he received from the Nacogdoches Police indicated that the Honda's driver was female and not speeding. (Tr. 37.)

2

expired and no active warrants) at 5:52 into the stop. Next, Finchum returned to Moore's vehicle to inform him that he was going to issue a warning for speeding. At that point, Finchum initiated a brief conversation with Moore about the purpose of his trip. Approximately eight minutes into the stop, Finchum returned to his patrol car to process the warning. He returned to Moore's vehicle approximately 10 minutes into the stop and asked Moore to step out to the rear of the vehicle and for consent to search:

> FINCHUM: Okay. You have a problem with me searching your car?
>
> MOORE: [U/I]. Go ahead.
>
> FINCHUM: I mean, yes or no?
>
> MOORE: Go ahead. Go ahead.
>
> FINCHUM: You don't mind?
>
> MOORE: If that's what you need to do, go ahead. I don't have a problem. I don't have anything [U/I]-
>
> FINCHUM: And you don't mind?
>
> MOORE: I didn't do anything, so yes. You can go search the car if you like.
>
> FINCHUM: Okay. All right.

(Ex. 7, p. 007011.) While conducting the search, Finchum had difficulty opening the trunk. Moore explained to him that "you gotta hold [the button]" and even assisted Finchum with the key to pop the trunk so that he could search the vehicle. About 17 minutes into the traffic stop, Finchum found 15 wrapped kilogram packages that were indicative of drug trafficking. (Tr. 33.) Finchum conducted a field test on one of the wrapped packages, which was positive for cocaine. (*Id.*)

## II.  Moore's Motion and The Government's Response

First, Moore challenges the validity of the stop because he argues that there is no objective evidence that he was speeding.  Specifically, he contends that the "dashcam does not indicate that radar was activated nor does it show the speedometer," resulting in a "purely pretextual" stop. (Dkt. #60, p. 2-3.)  Next, Moore claims that Finchum extended the stop beyond what was necessary to issue an "uncomplicated warning," and that there were no articulable facts to support "prolongation of the stop," which invalidated his consent to search the vehicle. (Dkt. #56, p. 4.)  The Government responds that Finchum had reasonable suspicion of criminal activity beyond a traffic violation due to the information he received from Nacogdoches Police, and that he worked diligently to dispel that suspicion such that the traffic stop was not unreasonably delayed. (Dkt. #59, p. 9.)

## III.  Legal Standard

The Fourth Amendment protects individuals from unreasonable searches and seizures. Traffic stops are considered seizures within the meaning of the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979).  Because traffic stops are considered more similar to investigative detentions than formal arrests, the legality of traffic stops for Fourth Amendment purposes is analyzed under the standard articulated in *Terry v. Ohio*, 392 U.S. 1 (1968).  *Terry* requires that courts apply a two-step "reasonable suspicion" inquiry to: 1) determine whether the officer's action was justified at its inception, and 2) determine whether the search or seizure was reasonably related in scope to the circumstances that justified the stop in the first place. *United States v. Zamora*, 661 F.3d 200, 204 (5th Cir. 2011).  When there is no warrant, as is the case here, the government bears the burden of establishing by a preponderance of the evidence that

the challenged search and/or seizure was valid. *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005).

"The decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996). Even a pretextual traffic stop does not violate the Fourth Amendment, so long as the officer making the stop has probable cause to believe a traffic violation has occurred. *United States v. Escalante*, 239 F.3d 678, 680-81 (5th Cir. 2001). The officer's subjective motivations, including motivations to investigate unrelated criminal acts, are not relevant to the inquiry. *See United States v. Cole*, 444 F.3d 688, 689 (5th Cir. 2006) ("The rule established by the Supreme Court in *Whren* allows officers to justify a stop by the occurrence of a traffic violation even though this is not the real reason for the stop" as long as the legal justification of the traffic stop is "objectively grounded."); *United States v. Melendez*, 127 F. App'x 708, 710 (5th Cir. 2005) (per curiam) ("Regardless of the patrol officer's subjective motivation for the stop, the stop was reasonable because he had probable cause to believe that [the defendant] was speeding." (citing *Whren*, 517 U.S. at 810, 812–13). In making a reasonable suspicion inquiry, a court must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Reasonable suspicion "is a low threshold" and exists when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure. *United States v. Castillo*, 804 F.3d 361, 364, 367 (5th Cir. 2015).

During such traffic stops, officers are permitted to detain individuals temporarily for instance, to "verify a violation of the traffic law has occurred or is occurring; and ... to issue the

5

appropriate ticket or citation charging the traffic violation or make an arrest of the driver based upon the violation." *United States v. Magana*, 544 F. Supp. 2d 560, 565 (W.D. Tex. 2008). However, once a stop is initiated, it cannot exceed "the time needed to handle the matter for which the stop was made." *Weisshaus v. Teichelman*, No. 22-11099, 2024 WL 620372, at *3 (5th Cir. Feb. 14, 2024) (citing *Rodriguez v. United States*, 575 U.S. 348, 350 (2015). "A seizure justified only by a police-observed traffic violation, therefore, 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Id.* "Once the purpose of a valid traffic stop has been completed and an officer's initial suspicions have been verified or dispelled, the detention must end unless there is additional reasonable suspicion supported by articulable facts." *United States v. Estrada*, 459 F.3d 627, 631 (5th Cir. 2006) (quoting *United States v. Machuca–Barrera*, 261 F.3d 425, 434 (5th Cir. 2001)).

### IV. The Traffic Stop Was Justified

The undersigned finds Finchum's testimony credible and the dash cam footage of the speedometer confirms that Moore drove the Honda at 73-74 MPH, in excess of the posted speed limit.[3]  Moreover, Moore's own admission during the roadside conversation corroborates Finchum's testimony:

> FINCHUM: …  I'm Lieutenant Finchum with the Rusk County Sheriff's Office. The reason I stopped you was going a little bit over the speed limit.
>
> MOORE: 1 mile over?
>
> FINCHUM: Well, I mean, you was [sic] passing that 18 Wheeler.
>
> MOORE: Yeah, I, I got scared.

---

[3] While Moore contends that Finchum could not have observed him speed while passing the 18-wheeler because they were travelling in opposite directions, the evidence shows that once Finchum caught-up to Moore, he observed him exceeding the posted speed limit as confirmed by his own speedometer.

…

      FINCHUM: You got up a little bit to get- to get around it. Is that why you sped up a little bit to get around them?

      MOORE: [U/I] scared. Yes, sir…

(Gov. Ex. 7, p. 00701-00702.)   "[Any] speed in excess of the limits established by [Texas law]" is a violation of the Texas Transportation Code.  TEX. TRANS. CODE. § 545.352(a).  Moore has not established that Finchum's stated reasons for effectuating the traffic stop were not "objectively grounded" and therefore, the undersigned finds that the initial traffic stop was justified at its inception because Finchum had an objective reasonable suspicion that Moore committed a traffic violation.  *See Cole*, 444 F.3d at 689.

### V.  The Detention Was Reasonable

The second step under the *Terry* framework requires a court to determine "whether the officer's subsequent actions were reasonably related in scope to the circumstances that caused him to stop the vehicle in the first place." *United States v. Phillips*, No. 22-50745, 2024 WL 323498, at *3 (5th Cir. Jan. 29, 2024) (citing *United States v. Smith*, 952 F.3d 642, 647 (5th Cir. 2020) (internal quotation marks and citation omitted).  Finchum had two reasons to initiate a traffic stop on Moore: (1.) information from Nacogdoches Police that a Black Honda was suspected of criminal activity, and (2.) Moore driving in excess of the posted speed limit.

Finchum's body cam footage[4] shows the following:

- 30 seconds into the stop, Finchum was outside Moore's passenger window where he introduced himself and requested Moore's license and insurance information.

---

[4] The timing is approximate, give or take a few seconds.  Also, Finchum's body cam was initiated while he was inside his patrol car.  It took him 20-30 seconds to initially approach Moore's vehicle.  The timeline referred to here relates to the time shown on Finchum's body cam footage.

- Finchum reviewed Moore's license and registration from the passenger window until 2:40 minutes into the stop. They discussed whether Moore also had proof of insurance, which he could not locate and therefore did not provide to Finchum. Finchum returned to his patrol vehicle at 2:50 and took photos of Moore's license and registration.

- 4 minutes in, while standing beside his patrol vehicle, Finchum contacted Dispatch for a return on Moore's license and registration.

- 5:40 minutes into the stop, Dispatch relayed that Moore's license was "eligible" and that he had no active warrants. Finchum was still standing by his patrol vehicle when he received the information.

- 6:20 minutes into the stop, Finchum returned to Moore's vehicle and advised that he would issue a warning only. Finchum and Moore had a two-minute conversation where Finchum asked for details about his trip.[5]

---

[5] FINCHUM: You headed back to Wisconsin?
MOORE: Yes, sir.
FINCHUM: Where you coming from?
MOORE: We just came from down in at, let me give you the right, Katy or some sh*t like that.
FINCHUM: Where at?
MOORE: Katy or something like that.
FINCHUM: Oh, that down around Houston?
MOORE: I think so.
FINCHUM: All right, you said we?
MOORE: Yeah, my cousin. I don't know if he passed me or if he still behind me. I don't know what the hell.
FINCHUM: Oh, y'all traveling in different cars?
MOORE: We lost each other somewhere along the way. But we're going to the same direction, you know what I'm saying?
FINCHUM: Is he from Wisconsin?
MOORE: Yes, sir.
FINCHUM: How come y'all are in separate cars?
MOORE: No, he, uh, he went- he had some girl down here. He brought a girl down here. I came down here to shop a little bit.
FINCHUM: Yeah? Oh, so he brought a girl and dropped her off or he just-
MOORE: Yeah, he brought a girl back. She had came up to visit.
FINCHUM: Okay.
MOORE: Came back and he drove her back.
FINCHUM: Okay.
MOORE: Yeah, I just came back with him so I could drive the [U/I].
FINCHUM: So did you ride down with him? Or y'all rode down in a separate car?
MOORE: No, we rode down in a separate car. He had that girl in the car with mine.
FINCHUM: Oh, you didn't want none of that? All right, here- When did y'all go to Houston?
MOORE: Uh, when was this Friday or Saturday? I think it was.
FINCHUM: Right? How long did it take to drive? Well, it's a haul from Wisconsin.
MOORE: Yeah.
FINCHUM: How long was that?
MOORE: We stopped- we stopped maybe two times to sleep.
FINCHUM: That me-
MOORE: It's like, uh, 18 hours. We stopped twice to sleep.
FINCHUM: Okay. Whew. Y'all wasn't there for what? A couple of days?

8

- Their conversation lasted until 8:25 minutes into the stop, when Finchum returned to his patrol vehicle to process the information relevant to the citation. He wrote Moore's name on the citation paperwork.

- 10 minutes into the stop Finchum returned to Moore's vehicle and asked him to step out of the car to answer some questions related to the citation. (Gov't Ex. 7, p. 7009.) The two stood outside the vehicle where Finchum verified the address and asked questions relating to Moore's travel plans while he completed the paperwork.

- 11:30 into the stop, while Finchum and Moore stood outside and behind Moore's vehicle, Finchum asked Moore if he had any contraband inside his vehicle.

- 12 minutes into the stop and before Finchum completed the warning citation paperwork, Finchum asked for and received consent to search Moore's vehicle.

- 17 minutes into the stop, Finchum finds the wrapped packages and instructs Moore to get on the ground.

- 19 minutes into the stop, Moore is detained in Finchum's vehicle and Finchum tested the packages.

Neither party disputes Moore's verbal consent—the evidence shows his consent was clear and unequivocal. However, Moore contends that his consent is invalid because of the unreasonable length of the traffic stop. The undersigned disagrees. The "[a]uthority for [a stop]...ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez*, 757 U.S. at 354. Although the Fifth Circuit has determined "there is no legal stopwatch for traffic stops," it has upheld traffic stops where the detention has lasted more than double the

---

        MOORE: Yeah, like, the weekend.
        FINCHUM: Where'd you shop at?
        MOORE: Uh, what mall was it? I can't remember the mall, uh, duh- duh- duh- -duh, I can't think of the name of the mall. Some mall, man. I wonder if I can look it up on my GPS and tell you.
        FINCHUM: Oh, there ain't no telling. There's a bunch of them down there.
        MOORE: Yeah, I can't remember the name of it, but we definitely have [U/I].
        FINCHUM: Okay.
        MOORE: That's a lot of business.
        FINCHUM: M'kay. You don't got no luggage?
        MOORE: No, my sh*t in the trunk.
        FINCHUM: Oh, okay. Okay. All right, like I said, we'll do that warning and, uh, and we'll get you good,    okay?
        MOORE: Yes, sir.
        FINCHUM: All right, be right back.

time that Moore was detained in this case. *See Phillips*, 2024 WL 323498, *4 (defendant's detention for 21 minutes for K9 and entire forty-minute stop was reasonable); *Pack*, 612 F.3d 341, 361–62 (35-minute stop was reasonable); *United States v. Galindo*, 447 F. App'x 633, 634, 636 (5th Cir. 2011) (45-minute delay before calling for K-9 unit was reasonable); *see also United States v. Grant*, 470 U.S. 654, 677 (1985) (20 minute detention was reasonable); *United States v. Sharpe*, 470 U.S. 675, 688 (1985) (20-minute stop was reasonable).

"In assessing whether a detention is too long in duration to be justified as an investigative stop, [the court] consider[s] . . . whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Sharpe*, 470 U.S. at 696. A police officer may permissibly examine the driver's license, insurance and registration, run a computer check, ask the driver about the purpose and itinerary of his trip, and issue a citation. *United States v. Brigham*, 382 F.3d 500, 507-508 (5th Cir. 2004); *United States v. Zucco*, 71 F.3d 188, 190 (5th Cir. 1995). A police officer may also ask the driver of a vehicle to exit the vehicle that has been stopped for a traffic violation. *See Maryland v. Wilson*, 519 U.S. 408, 410 (1997); *Pennsylvania v. Mimms,* 434 U.S. 106, 111 (1977).

Here, Moore and Finchum engaged in friendly conversation (presumably to dispel suspicion raised from the Nacogdoches Police's tip that the Honda was suspected of criminal activity and also for Moore to provide information relevant to the warning citation) while Finchum was completing the necessary paperwork for the citation. Finchum's questioning did not lengthen the detention because it occurred as a matter of course in issuing Moore the citation and Moore consented to the search of the vehicle before Finchum gave him the citation. Under these circumstances, Finchum's actions were necessary to effectuate the purpose of the stop,

10

dispel suspicion of criminal activity, and were performed without unreasonable delay. *See, e.g., United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001) (finding traffic stop duration reasonable where fourteen minutes elapsed before defendant consented to a search and officer had not yet given the citation to the defendant).

## VI.  Conclusion

"The judge's role at a suppression hearing is to determine the credibility of witnesses and find the facts." *United States v. Jones*, 187 F. Supp. 3d 714, 723 (M.D. La. 2016). Here, the undersigned finds Finchum's testimony credible and the evidence establishes that Finchum observed Moore commit a traffic violation.[6] Therefore, the traffic stop was justified at its inception. *See United States v. Lopez-Moreno*, 420 F.3d 420, 432 (5th Cir. 2005) (witnessing a traffic violation is an objectively reasonable basis on which to conduct a traffic stop). Furthermore, the duration of the roadside detention was reasonable under the circumstances because Finchum worked diligently to effectuate the purpose of the stop. Any further delay is attributed to searching of the vehicle after Moore gave valid consent and finding contraband. Accordingly, the undersigned recommends denying Moore's *Motion to Suppress.*

## VII.  Objections

Pursuant to 28 U.S.C. § 636(b)(1)(C), each party to this action has the right to file objections to this Report and Recommendation. Objections to this Report must (1) be in writing, (2) specifically identify those findings or recommendations to which the party objects, (3) be served and filed within **SEVEN (7)** days after being served with a copy of this Report, and (4) be no more than eight (8) pages in length. *See* 28 U.S.C. § 636(b)(1)(C); FED. R. CRIM. P. 59(b)(2); E.D. Tex. Local R. CR-59(c). A party who objects to this Report is entitled to a *de novo* determination by the United States district judge of those proposed findings and

---

[6] Finchum's testimony was corroborated by dash cam footage that he was following Moore at 73-74 MPH.

recommendations to which a specific objection is timely made. 28 U.S.C. § 636(b)(1)(C); FED. R. CRIM. P. 59(b)(3).

A party's failure to file specific, written objections to the proposed findings of fact and conclusions of law contained in this report, within fourteen (14) days of being served with a copy of this report, bars that party from: (1) entitlement to *de novo* review by the United States district judge of the findings of fact and conclusions of law, *see Rodriguez v. Bowen*, 857 F.2d 275, 276–77 (5th Cir. 1988), and (2) appellate review, except on grounds of plain error, of any such findings of fact and conclusions of law accepted by the United States district judge, *see Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

SIGNED this 6th day of May, 2024.

_____
Zack Hawthorn
United States Magistrate Judge